1                UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,      ) Case No. LA CR 24-00091-ODW
                                  )
5            Plaintiff,           ) Los Angeles, California
                                  )
6  vs.                            ) Monday, September 9, 2024
                                  )
7  ALEXANDER SMIRNOV,             ) (11:33 a.m. to 11:35 a.m.)
                                  ) (11:46 a.m. to 12:25 p.m.)
8            Defendant.           )
   _____)
9

10               TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE OTIS D. WRIGHT II
11               UNITED STATES DISTRICT JUDGE

12

13 Appearances:                   See next page.

14 Court Reporter:                Recorded; CourtSmart

15 Courtroom Deputy:              Sheila English

16 Transcribed by:               L. Caldwell
                                  Echo Reporting, Inc.
17                                9711 Cactus Street
                                  Suite B
18                                Lakeside, CA 92040
                                  (858) 453-7590
19

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

2

1  APPEARANCES:

2  For the Plaintiff:          CHRISTOPHER M. RIGALI, ESQ.
                               LEO J. WISE, ESQ.
3                              SEAN MULRYNE, ESQ.
                               Office of Special Counsel
4                              United States Department of
                                 Justice
5                              950 Pennsylvania Avenue,
                                 Northwest
6                              Room B-200
                               Washington, DC 20530
7                              (202) 616-2652
                               (771) 217-6091
8                              (202) 430-4880

9  For the Defendant:          DAVID Z. CHESNOFF, ESQ.
                               RICHARD A. SCHONFELD, ESQ.
10                             Chesnoff and Schonfeld
                               520 South Fourth Street
11                             Las Vegas, Nevada 89101
                               (702) 384-5563
12
                               NASER J. KHOURY, ESQ.
13                             Naser J. Khoury Law Offices
                               14427 Sylvan Street
14                             Van Nuys, California 91401
                               (818) 654-0001
15

16

17

18

19

20

21

22

23

24

25

3

1   Los Angeles, California; Monday, September 9, 2024 11:33 AM

2                           --o0o--

3                    (Call to Order)

4          THE CLERK:  Calling Item 1, CR 24-91, United

5   States of America versus Alexander Smirnov.

6          Counsel, may I have your appearances, please.

7          MR. RIGALI:  Good morning, your Honor.  Assistant

8   Special Counsel Christopher Rigali on behalf of the

9   Government, along with Assistant Special Counsels Leo Wise

10  and Sean Mulryne.  Good morning, your Honor.

11         THE COURT:  Good morning, gentlemen.

12         UNIDENTIFIED SPEAKER:  Good morning.

13         MR. SCHONFELD:  Good morning, your Honor.  Richard

14  Schonfeld, David Chesnoff, and Naser Khoury, appearing on

15  behalf of Alexander Smirnov.  Mr. Smirnov is present in

16  custody.

17         THE COURT:  Good morning, sirs.

18         MR. SMIRNOV:  Good morning, your Honor.

19         THE COURT:  All right.  The nature of this

20  hearing, at least as calendared, was on the Defendant's --

21  or the Government's motion for a protective order under CIPA

22  Section 4, and, of course, the Defendant is also -- has made

23  a motion for access to certain materials.  So that's what

24  we're going to deal with today.  The motion for protective

25  order is fairly easy.  I don't even have any discretion with

4

1 respect to whether or not to issue a protective order.

2 There may be some discussion regarding some of the

3 parameters of that protective order, but we'll deal with

4 that, if necessary.

5          But I've also been alerted to something else that

6 we're going to have to deal with.  Would you gentlemen like

7 to express it?

8          MR. CHESNOFF:  May it please the Court, your

9 Honor.  We would request a CIPA hearing out of the presence

10 of the public, so that we can discuss the issue with the

11 Court.

12          THE COURT:  I am confident that it's not a

13 frivolously made motion, so we will take a recess now and

14 hearing your motion out of -- well, off the record.

15          MR. CHESNOFF:  Thank you, your Honor.

16      (Proceedings recessed briefly.)

17          THE CLERK:  Back on the record.

18          THE COURT:  All right.  If anyone feels necessary

19 or burning desire to make some comment on the record as to

20 why it was necessary for us to take a recess, fine.  Given

21 the fact that there is going to be briefing on this

22 particular point, I personally don't have that burning

23 desire, but, if anyone else wishes to fill the void, please.

24          MR. CHESNOFF:  No, thank you.

25          MR. RIGALI:  All set, your Honor.  Thank you.

5

1    THE COURT:  All right.  Then let's move on to the
2  motion, the motion for the protective order.  As the defense
3  has noted, I reviewed the documents ex parte, in camera, and
4  I signed the protective order -- was it mid-July?  All
5  right.  And it's also now my understanding that the
6  Defendant wishes to see what I saw.  Is that correct?  And
7  the Government's position is?
8    MR. RIGALI:  The Government's position, your
9  Honor, is that there's a wall of case law in opposition to
10  the Government's motion -- excuse me, the defense's
11  motion -- for access to the Government's classified ex parte
12  filing.
13    THE COURT:  Otherwise, why would there be
14  provisions for it to be in camera and ex parte?
15    Obviously, the defense feels that there is a
16  compelling need to see what I have seen that I felt
17  warranted the execution of the proposed protective order, as
18  opposed to just a fishing expedition or just idle curiosity.
19  Is there something you'd like to share with me?
20    MR. SCHONFELD:  If I may approach the lectern,
21  your Honor.
22    THE COURT:  Certainly.
23    MR. SCHONFELD:  Your Honor, just for purposes of
24  clarity, I'm going to argue the motion for access to the
25  CIPA 4 filing.  Mr. Chesnoff is going to argue the

6

1   opposition to the motion for protective order that's on for

2   today.

3        What the Court was referencing was the ex parte

4   CIPA 4 filing from back in June, whereas we don't have the

5   CIPA protective order in place yet.  That's what's going to

6   be addressed by Mr. Chesnoff.

7        THE COURT:  All right.  And maybe I should just

8   wait.  Yes, I'll wait, because I don't -- let me hear if

9   there's going to be some objections to the protective order.

10       MR. SCHONFELD:  Okay.  I'll address our motion to

11  unseal the CIPA 4, then, after Mr. Chesnoff addresses the

12  protective order.

13       THE COURT:  Okay.

14       MR. SCHONFELD:  Okay.  Thank you, your Honor.

15       MR. CHESNOFF:  May it please the Court, your

16  Honor.  Considering the fact that the Court has done

17  extensive review of all the pleadings, and we've had an

18  opportunity to brief this thoroughly, I'm going to limit my

19  comments to try and put into context the reason why we feel

20  the Government's position does not apply in our situation.

21       First of all, your Honor, as a result of our own

22  investigation, we want the Court to understand that Mr.

23  Smirnov had a handler who belonged to the FBI.  It's our

24  position, and will be our position throughout the

25  litigation, your Honor, that the handler's techniques were

7

1  inconsistent with the requirements of the FBI and the

2  Justice Department as far as the way Mr. Smirnov was

3  handled.

4          Without going into great detail, your Honor,

5  different things occurred that are very inconsistent with

6  the way someone like Mr. Smirnov was supposed to be handled.

7  For example, your Honor, phone conversations occurred on

8  people's personal phones, as opposed to government-issued

9  phones.  Texts were made over personal phones.  The agent

10  spent social and private time with the Defendant over a

11  lengthy period of time, over years.

12          So I'm trying to explain to the Court that the

13  personal relationship with the handler actually makes the

14  fact that we're being asked to restrict ourselves now a

15  little inconsistent with the way the FBI dealt with Mr.

16  Smirnov throughout his work for the Government.

17          He was never requested, at any time that we're

18  aware of, to get security clearance, your Honor.  He was

19  never polygraphed, as far as we understand, during the

20  period of time that he worked with the Government.  Now he's

21  being asked to sign a document, your Honor, restricting his

22  discussions, and I'm going to limit myself there.  I'm going

23  to stop there, your Honor.

24          So what I'm trying to tell your Honor is this.

25  The Government is asking us to share information with them

8

1  about our defense prior to us receiving materials, which,

2  most candidly, your Honor, is going to be revealing to our

3  courtroom adversaries we have a great deal of respect for

4  our thoughts, our strategies, our work product, and, in

5  fact, our intended defenses.

6          It's inconceivable to me that an Article 3 court

7  could countenance the idea of a Defendant having to share

8  with the Government his ideas about what he wants and when

9  he wants it in order to get permission to look at things

10 that we believe he's entitled to, and, of course, your Honor

11 can evaluate it, and the Ninth Circuit, your Honor, in the

12 Sedaghaty case, 728 F.3d 885:

13          "We understand that the government must

14          safeguard, but the District Court must

15          protect a defendant's right to a fair

16          trial."

17          And what we're saying here, your Honor, is that,

18 in the context of this particular case, and in the context

19 of the relationship that the Government and its agents had

20 with Mr. Smirnov, to suddenly, all of a sudden, impose

21 draconian requirements when, in fact, it was pretty much a

22 free-for-all for the entire time that he worked for the

23 Government.  We find that difficult to understand.

24          Finally, your Honor, the Government made a point

25 in its reply -- I need to find the exact quote.  It says,

9

1  "By his own admission, Defendant has ties to a hostile
2  foreign intelligence service."  Your Honor, that statement
3  by the Government has clouded the perception of Mr. Smirnov
4  by painting him as somehow being a foreign spy.  Nothing
5  that Mr. Smirnov did, that we are aware of from the
6  discovery we have received so far, suggests that Mr. Smirnov
7  did anything with any foreign agent that wasn't known to his
8  handler, requested by his handler, debriefed by his handler.
9  At no time have we seen anything to indicate that Mr.
10  Smirnov withheld from the Government his contact with these
11  people, nothing.
12          So, since the beginning of this case, including
13  early on, your Honor, the Government tells you that he is an
14  agent of a foreign government.  The reality is, he is not an
15  agent.  He didn't have ties to hostile foreign governments.
16  He had contact, at the direction of the Government.  We
17  wanted to put that in context for you, your Honor, so you'd
18  understand that this continuance -- continuing reference to
19  him as somehow being an agent of a hostile power is clouding
20  and prejudicing the case, and is prejudicing your Honor's
21  decision about what we get to see, when we get to see it,
22  and what we have to do to get to see it.
23          So, most respectfully, your Honor, we think, in
24  the context of this case, the Government's reaction and
25  requests are over-broad and do not apply.  Thank you, your

10

1 Honor.

2          THE COURT:  Okay.  I appreciate that, and when I

3 read that, well, I may have raised my eyebrows, but not to

4 the extent that as you've characterized what I suppose a

5 natural reaction would be.  I just simply took it to mean

6 that he is either in frequent communication or he has the

7 ability to communicate with individuals in the intelligence

8 services, but, if he didn't have the abilities to have those

9 kinds of contacts, I question what good he would be to the

10 FBI in a case like this.  So I'm afraid I didn't get --

11          MR. CHESNOFF:  I'm glad to hear it, your Honor.

12          THE COURT:  I have to look at the context that

13 we're in.  Okay?  It's not the context of my everyday

14 experiences, perhaps not even yours, right?  This is

15 television stuff, right?  So I understand -- let me put it

16 this way.  What I often hear is people coming in here with

17 their hair on fire because of an undercover operative of

18 some kind has gotten into a drug trafficking organization,

19 and now the other side is going, "But this is a horrible

20 person.  I mean, look at his record.  Look at his

21 background.  He is not to be believed."  Of course he's a

22 dirtbag.  That's how you get access.  That's how you get

23 entree into these organizations.

24          I'm not saying -- "dirtbag" doesn't apply here,

25 but being able to communicate and call someone in one of the

11

1  intelligence agencies means that you've got some kind of a

2  background.  You've got some kind of a resume that will

3  grant you entree, or at least a telephone call, and that's

4  the only -- that's the way I took it, nothing else,

5  absolutely nothing else, and nothing that would cast any

6  aspersions on the way he was handled, on his character, or

7  anything else.  It's just, "This guy has got more experience

8  out there than I've got."  That's it.  Okay?

9          MR. CHESNOFF:  We're appreciative, your Honor.

10          THE COURT:  Okay.

11          MR. CHESNOFF:  Thank you for hearing us.

12          MR. RIGALI:  Good morning, your Honor.

13          THE COURT:  Good morning, sir.

14          MR. RIGALI:  I'm going to spend my time this

15  morning explaining why the terms of the CIPA Section 3

16  protective order are both reasonable and appropriate in this

17  case.  I'm not going to rebut all of Mr. Chesnoff's factual

18  points, because I think to do so would go into the realm of

19  classified information, and this is not a sealed or

20  classified hearing, but I don't need to do that.  I'm here

21  to explain why the Court should enter the protective order

22  as written, because it's reasonable and it's appropriate for

23  the circumstances in this case.

24          THE COURT:  Is there -- wait a minute.  I haven't

25  heard anyone say that it should not be entered, that there's

12

1 an objection to the Court entering the protective order.

2         MR. RIGALI:  I think the Defendant's -- the

3 defense opposition is to entering the Section 3 protective

4 order as written.  I think they have challenged two

5 particular provisions of the Section 3 protective order, and

6 that's how I understand what they're challenging, is they

7 don't want the Court to enter the Section 3 protective order

8 that the Government filed as it was filed.

9         They want it to be modified or not entered, but

10 they have issue with two provisions, and that's why I'd like

11 to discuss here today, because, frankly, in the context of

12 this case, your Honor, both of these provisions are

13 reasonable, and, frankly, I think one of the key points here

14 this morning is that both of their arguments clearly rely on

15 faulty readings of the protective order as written.

16         As the Court mentioned, back in July, the Court

17 entered a Section 4 protective order allowing the Government

18 to do certain things.  At this point, the Government is

19 prepared to produce a small amount of classified discovery

20 to defense counsel.  The only thing that's holding us up

21 from producing classified discovery to defense counsel is

22 the absence of this Section 3 protective order.

23         Let me talk about the Defendant's challenges to

24 the protective order.  The concerns that the Defendant has

25 raised are overblown, they're premature, and, again, they

13

1 rely on a faulty reading of the terms of the protective

2 order.  So, your Honor, one of their challenges is to this

3 memorandum of understanding that is appended to the Section

4 3 protective order.  The parties are referring to that

5 memorandum of understanding as the "MOU."

6         On page three of the Defendant's brief -- I'm

7 going to read this -- this is their problem with the MOU.

8 It's in paragraph one of the MOU, but, on page three of

9 their brief, they wrote the following:

10         "The MOU requires a signature from the

11         Defendant and a representation of 'I

12         agree that I shall never divulge,

13         publish, or reveal, either by word,

14         conduct, or any other means such

15         classified documents and information

16         unless specifically authorized in

17         writing to do so,' dot, dot, dot."

18         They end the sentence there.  Defense counsel rely

19 on that language, and that language alone, then writes

20 immediately:

21         "This provision" -- paragraph one of the

22         MOU -- "does not provide any exception

23         to classified information that is

24         already in the Defendant's possession or

25         within his knowledge in an unrestricted

14

1            capacity as a result of his having put

2            in over one decade of service to the

3            United States."

4            In other words, Judge, what they're saying, the

5    defense counsel, is that if their client has information in

6    his head that's classified, that he can't tell them that

7    information, and that's not true.  That's not true.  Their

8    argument relies on a selective reading of the protective

9    order.  If you actually look at paragraph one of the MOU,

10   they've essentially excised half of it to make this

11   argument.  Paragraph one of the MOU says this:

12            "I agree that I shall never divulge,

13            publish, or reveal, either by word,

14            conduct, or any other means, such

15            classified documents and information

16            unless specifically authorized in

17            writing to do so by an authorized

18            representative of the United States

19            government, or" -- and this is the

20            language they don't quote -- "or as

21            expressly authorized by the Court

22            pursuant to this protective order."

23            And if you look at paragraph five of the

24   protective order -- and, of course, this is -- you read the

25   entire thing in totality -- paragraph five says this:

15

1           "If the Defendant is aware of classified

2           information relating to this case, the

3           Defendant may also disclose such

4           classified information to clear defense

5           counsel in an appropriate secure area as

6           necessary for the preparation of his

7           defense."

8           So the MOU says the Defendant can't divulge

9   classified information unless he's expressly authorized to

10  do so.  Paragraph five gives him express authorization to

11  say whatever information he has in his head.  Whatever

12  information is in his head he can share with his lawyer.

13  It's expressly authorized by the provisions of the

14  protective order.  It's a reasonable and narrow restriction.

15          The only thing that it does, your Honor, the only

16  thing that it does, is limit the Defendant in where he can

17  share this information with his lawyers.  He can't share the

18  information with his lawyers over the phone.  He can't share

19  the information with his lawyers in gen pop, when other

20  inmates are around.  But the classified information security

21  officer, Mr. Slade (phonetic), has said that there will be a

22  space in the detention facility where the Defendant can

23  discuss the classified information with his lawyers.

24          Our understanding is that the Defendant and his

25  counsel are mainly concerned about limitations on his

16

ability to share information with his lawyers, and, as we've
been discussing, he really isn't restrained from sharing any
information with them.  He can make full and uninhibited
disclosures of whatever information he wants to his lawyers
so long as they take place in an area designated by the
classified information security officer.

Now, to the extent he wants to disclose classified
information to people outside of his defense team, we think
that's a separate issue, and opens up a can of worms for the
Defendant, and if that's what he is arguing, which I don't
think it is, then I think we can address that at another
day.

The other issue that the defense counsel take,
your Honor, with the protective order as written by the
Government is that, in paragraph six of the protective
order, it permits the Government to mark some or all of the
classified discovery as essentially for attorneys'-eyes-only
review.  So, unless the Government marks the classified
discovery for display to the Defendant, defense counsel are
prohibited from sharing that classified information with
him.

Your Honor, this type of provision in paragraph
six has been upheld by numerous courts, including the Ninth
Circuit, and we've cited all these cases in our brief, on
pages eight and nine.  There was a Ninth Circuit case from

17

1  this year, from 2024, and there the Court stated:

2          "The Defendant" -- quote -- "recognizes

3          that our precedent four closes the

4          argument that his constitutional rights

5          were violated because his counsel was

6          prohibited from sharing or discussing

7          certain secret-level documents with

8          him."

9          That's 94 F.3d 782, at page 11.  Defense counsel

10  argue that if they want to share the classified discovery

11  with their client -- and Mr. Chesnoff was referencing

12  this -- they're saying, "We have to disclose to our

13  adversaries.  We have to go to Government counsel and say,

14  'Disclose what our defense strategy is,' and that's a

15  violation of the Sixth Amendment.

16          But, again, that argument is wrong.  It relies on

17  another misreading of the protective order, because

18  paragraph one of the protective order, which is not

19  discussed or cited by the Defendants in their briefing at

20  all, says that a defense counsel can move this Court at any

21  time for good cause to modify the protective order.

22          So, if they get the classified discovery, and it's

23  not for sharing with the Defendant, if they say, "We can't

24  mount and prepare a defense here.  We really, really, really

25  need to discuss this information with our client," they can

18

1  move the Court for appropriate relief.  Now, the Government

2  probably would oppose some of that relief, but they would

3  need to show that he's prejudiced by that.

4         Your Honor, what they're asking the Court to do is

5  to force the disclosure of all of the classified discovery

6  to the Defendant himself.  This Defendant does not have, nor

7  has he ever had, a security clearance, and, importantly, as

8  the Government has told defense lawyers, Mr. Smirnov does

9  not know all of the information contained in the classified

10 discovery.  He does not know all the information in the

11 classified discovery.

12        So it's not the case that the Government is trying

13 to withhold from him information that he already knows.

14 There's a bunch of stuff that he doesn't know, and the

15 Government thinks the best and prudent course here would be

16 for the Court to enter the protective order as written, to

17 allow Mr. Chesnoff and Mr. Schonfeld to see the classified

18 discovery, review it and discuss it, and then, if they feel

19 the burning desire to discuss it with their client, they

20 could seek the Government's approval, or they could move

21 this Court.

22        This is a procedure, your Honor, that numerous

23 courts have blessed.  We cited a number of cases in our

24 brief upholding this exact type of provision, and one of

25 those cases is the Rezac (phonetic) case out of the D.C.

*Echo Reporting, Inc.*

19

District Court.  In that case, the Court upheld a very
similar provision, and said the following:

> "The protective order, which generally
> limits disclosure to the Defendant's
> counsel, avoids that harm without
> prejudicing the defense.  Even without
> Mr. Rezac's personal knowledge of
> national security secrets, Defendant's
> counsel can construct most of his
> defense perfectly well.  The sensitive
> information is generally more useful to
> his counsel than to him, since it is
> being sought more to support his legal
> defenses than to rebut any facts."

The District Court in Rezac also, your Honor,
relied on what I said earlier, relied on the provision of
the protective order that allows the defense lawyers to come
back to the Court and seek relief as appropriate.  What this
provision boils down to is a very, very reasonable
restriction.

All the Government is asking, that, in the first
instance, the Government be permitted to mark some
classified discovery for defense counsel's eyes only.  If
they feel like their client's constitutional rights are
violated by that, they should move this Court at a later

20

1 date.  They don't have to come to the Government.  At that

2 point, the cases are pretty clear that they would have some

3 burden of establishing why he is prejudiced by not being

4 able to view the classified discovery himself.

5       Again, your Honor, I think there's -- both of the

6 arguments and the challenges raised by the Defendant in his

7 papers misread the protective order entirely.  They don't

8 even discuss, they don't even discuss once, paragraph five,

9 which says that he can disclose whatever information he

10 wants to his cleared lawyers.  They don't discuss it at all,

11 and they don't discuss paragraph one, which allows them to

12 seek court relief as appropriate for a good cause.

13       I think the protective order is reasonable.  It's

14 reasonable in a case where Defendant doesn't have a security

15 clearance, where the Defendant doesn't already know all the

16 classified information at issue, and where the Defendant

17 does, in fact, have ties to a hostile foreign intelligence

18 service.  I think that is relevant.  It is relevant to

19 whether the Government should be disclosing to Defendant

20 himself classified information.

21       I'm happy to answer any questions the Court has on

22 the CIPA 3 protective order issue.

23       THE COURT:  Thank you, sir.

24       MR. CHESNOFF:  Your Honor, I'll only briefly say

25 the following.  As of today's date, with no protective order

21

1   in place, Mr. Smirnov, according to the Government, can

2   share whatever information he has in his head.  Now the

3   Government is saying he needs to sign something that

4   restricts him from discussing the things that, if they were

5   so crucial to national security, you would have thought, in

6   the decade that he worked with the FBI, somebody would have

7   put a constraint on him.

8           That's why I'm trying to explain to the Court this

9   particular case is unique, because we're dealing with

10  someone who obviously was trusted by members of the Justice

11  Department to learn things, to gather things, and now he's

12  being asked to stop talking about them.  The idea that he

13  can talk to us -- but then my colleague makes the point.

14  However, it becomes a murky area when he wants to talk to

15  anybody else.  So that means he can't talk to witnesses.  He

16  can't talk to people that he knows might help him.  And

17  we're in that bind now regardless of what the Court does

18  with respect to this.

19          So I'm asking you, your Honor, just to consider

20  the fact that the protective order as requested in this case

21  is inappropriate because of the Defendant's prior activities

22  on behalf of the Government.  Thank you.

23          THE COURT:  You might guess that this gives me

24  some pause, if he does not wish to be bound by the

25  provisions of -- the confidentiality provisions of the

*Echo Reporting, Inc.*

22

protective order.  That does give me pause.  Matter of fact,
if there's anyone in this courtroom who feels constrained to
executed the protective order because they do not want to be
constrained by the provisions of the protective order, that
gives me pause.  So I'm not sure that that's what you're
saying, but, well, all right.  First things first.

I'm going to sign the protective order as it's
written, and then we'll take it one step at a time from
there, but counsel is correct.  If you wish some relief,
some latitude, come.  All right?  And nothing -- we're going
to do absolutely nothing to interfere with your ability to
mount a vigorous defense, and if there are documents that
will enable you to do that, then, by all means, you're
entitled to those things, absolutely entitled.  So,
anyway --

MR. CHESNOFF:  Thank you, your Honor.

THE COURT:  I'm not sure -- well, I'm not sure
exactly how we're going to proceed here because, like I
said, I can execute the protective order.  What happens to
it after that, well, will happen, and I will be apprised of
people's position with respect to whether or not they wish
to sign off on it, and then we'll go from there, but I can
tell you now that anyone who doesn't want to sign off on the
protective order and agree to being bound by the provisions
of that protective order, basically, you're just nullifying

23

1  the protective order.  That is going to impact your access

2  to classified materials.

3          Anything else we need to talk about?

4          MR. SCHONFELD:  Yes, your Honor.  We still have to

5  address the Defendant's motion for access to the CIPA 4

6  filing, Docket Number 98.

7          THE COURT:  All right.  Maybe we should have done

8  that first.

9          MR. SCHONFELD:  It's a little different, your

10 Honor, and I'll be brief.  So really, your Honor, what we

11 have here is, the Government filed a CIPA 4 filing, and the

12 process under CIPA 4 is that the Government presents to the

13 Court, through the CIPA process, the classified information

14 discovery, and, generally speaking, because we don't have

15 access to it yet, the Government will then either ask the

16 Court for permission to exclude certain aspects of that

17 discovery from being produced to the Defendant's counsel,

18 who are security cleared, or they seek permission from the

19 Court to do a summary of it, and they ask the Court to, you

20 know, ratify that this is a sufficient summary of the

21 classified information discovery, and then security-cleared

22 counsel gets to review it, and now it will be under the

23 confines of the protective order that the Court just

24 entered.  What we're seeking here, your Honor, given that

25 Mr. Chesnoff and I do have interim security clearance, is

24

1    the ability to see what was filed with the Court, at a

2    minimum, if the Court is not going to grant that, a redacted

3    version of it.

4            And the reason I say that, your Honor, is that the

5    Government filed the ex parte motion, which we do understand

6    CIPA permits, and it's up to the discretion of the Court,

7    but they also sought a motion to exceed the page limitation,

8    which means that the filing that they submitted to the Court

9    was lengthy, and I speculate -- and, again, the Ninth

10   Circuit has recognized that defense counsel is at a

11   disadvantage in these types of proceedings, because we

12   haven't seen it.

13           So we can only speculate or make an educated guess

14   that not all of that entirety of the excessive page

15   limitation document is classified, and that there must be a

16   method by which the Government could redact portions of that

17   to excise the classified information discovery that we are

18   not going to ultimately receive, so that at least we can see

19   in context what the Court has viewed in that ex parte

20   fashion, and we would ask that that be granted in terms of

21   attorneys'-eyes-only access.  We're comfortable with that,

22   but, your Honor, we do believe that we're entitled to see at

23   least portions of the CIPA 4 filing, if not all of it.

24           And when we look at some of the case law, your

25   Honor, while CIPA does permit the Court to allow ex parte

25

1  proceedings, it's supposed to be done sparingly, and,

2  specifically, there's a quote from the Libby (phonetic) case

3  that I think is pretty guiding, and what it says is:

4           "While this Court is disquieted by the

5           prospect of having to make such a

6           determination through ex parte

7           proceedings, and trusts that, because

8           defense counsel in this case have

9           security clearances, the need for such

10          proceedings will be rare, it can

11          certainly envision situations where

12          materiality will have to be addressed ex

13          parte in Section 4 proceedings."

14          And the reason I read that quote is because it

15  says that it's supposed to be "sparingly," and when you have

16  a motion that exceeded the page limitation or word

17  limitation, to me, that just doesn't seem to be "sparingly."

18          The last case that I'll cite, your Honor, is a

19  case that you've already heard today, is the Sedaghaty case,

20  which is 728 F.3d 885, which gives some additional case.  In

21  this case, the Ninth Circuit Court of Appeals reversed the

22  conviction of the Defendant, finding that the summary that

23  the Government had provided of the classified information

24  under the CIPA 4 procedure was inadequate, and that the

25  Government had withheld impeachment evidence.

26

And what the Ninth Circuit said in that
circumstances is that, because the Defendant has to approach
this in a vacuum, and recognize that Defendant is at a
disadvantage as a result of that, that the Court should
effectively sit in the shoes of a defense lawyer when
reviewing that discovery, and figure out what the theory of
defense is, and make a determination as to what aspect of
the classified information discovery should be produced, and
which parts aren't material or relevant.  And I surmise that
it would be difficult for the Court to do that at this
point, because the Court is not aware of what our theory of
defense is.  We haven't been in a position to present it
yet.

THE COURT:  Didn't you mention in -- well, if
you're not in a position yet to actually say, "Okay.  This
is going to be our defense," what kind of a job do you think
I'm going to do at guessing what your defense may ultimately
be down the road?

So do you also think it would be inappropriate if
you and the Court had a conversation about that defense, and
the extent to which or the degree to which some of these
documents might shed some light or evidence on the
development of that defense?  Might you not have to confer
with the Court regarding why these documents might be useful
to you?

27

1          MR. SCHONFELD:  And I would -- we would welcome

2    that opportunity, your Honor, to give the Court some

3    enlightenment on the theory of defense so that, when it does

4    analyze the CIPA 4 documents, it can make a determination as

5    to what's relevant and material.

6          THE COURT:  Okay.  This is all doable.

7          MR. SCHONFELD:  And then, your Honor, the last

8    thing I'd reference is that ex parte hearings are generally

9    disfavored, and the CIPA procedures are intended to endeavor

10   to harmonize the Defendant's right to a fair trial, with the

11   right to protect classified information, and what the Court

12   just set out as an example of what could occur would be

13   acting consistent with that harmonizing.

14          So, if the Court were not to let us see the CIPA 4

15   filing or a redacted version of the CIPA 4 filing, I think

16   it would be beneficial to the Court to hear from the defense

17   in terms of what the theory of defense is, so that it can

18   make a thorough analysis of the CIPA 4 material, and whether

19   or not we're actually receiving what we're entitled to

20   receive.

21          THE COURT:  In this case, as in all criminal

22   cases, I only have one job, and that's to make sure that the

23   Defendant gets a constitutionally effective defense.  So I'm

24   not sure why it's been mentioned so many times that there's

25   been an ex parte communication with the Government, as

28

1  though somehow I might be in league with the Government.

2  That is not the case.  If I'm in league with anyone, it's to

3  make sure that that man's constitutional rights are

4  protected.

5        MR. SCHONFELD:  And I appreciate that, your Honor.

6  I wasn't suggesting any impropriety.  CIPA 4 permits those

7  ex parte proceedings.

8        THE COURT:  It was just mentioned so many times.

9  There's been one, and so many times now it's been mentioned

10 that they must be used sparingly.  Well, that's pretty

11 spare.  Okay.  I hear you.

12       MR. SCHONFELD:  Thank you, your Honor.

13       THE COURT:  All right.

14       MR. RIGALI:  Your Honor, if I may just address a

15 few things here.  Thank you.

16       As Mr. Schonfeld recognized, CIPA Section 4

17 expressly authorizes ex parte practice.  At least one

18 District Court has said that ex parte Section 4 practice is

19 effectively the rule, and that is effectively the rule.

20 That's how this works in pretty much every criminal case

21 across the country, and, notably, the Defendant has not

22 cited a single case, a single case, really, in support of

23 his decision.

24       I'm perplexed that the defense would cite

25 Sedaghaty.  In 2013, when the Ninth Circuit decided

29

1  <u>Sedaghaty</u>, the Ninth Circuit said broadside challenges to

2  CIPA's in camera and ex parte proceedings is a battle

3  already lost in federal courts.  So, 11 years ago, this is a

4  battle already lost in federal courts, and what's puzzling

5  about their reliance on <u>Sedaghaty</u> is, in that case, in

6  <u>Sedaghaty</u>, the Defendant argued, quote:

7          "That his security-cleared counsel

8          should have had access to the classified

9          documents and discovery."

10          The Ninth Circuit rejected that argument, noting,

11  quote:

12          "The simple fact that defense counsel

13          held security clearances does not mean

14          that the attorneys were entitled to

15          access the Government's classified

16          filings."

17          The Ninth Circuit, the Second Circuit, the Sixth

18  Circuit, the federal courts of appeal, are pretty unanimous

19  on this issue.  Just because defense lawyers get clearances,

20  they absolutely should not get access to the Government's

21  Section 4 filing because it would -- as your Honor mentioned

22  earlier, it would defeat the entire purpose of Section 4.

23  Section 4 permits the Government to safeguard its interest

24  in protecting and keeping a close hold on classified

25  information while simultaneously satisfying its discovery

30

1  obligations, and that's what it's done here.

2        The case is so clear on this issue, I'm not going

3  to spend much other time on it.  I'll just note two other

4  things.  Some courts across the country -- and your Honor

5  just mentioned this to Mr. Schonfeld.  Some courts across

6  the country have permitted defense counsel to make an ex

7  parte filing where defense counsel discloses their potential

8  defense theories in order to aid the Court's review of the

9  Government's Section 4 filing.

10        I'm not going to take a position on that right

11  now.  I do know that it's something District Courts across

12  the country do.  The Government is confident that the

13  summaries that get provided to the Court are neutral and

14  evenhanded, and satisfy the Ninth Circuit's standard for

15  summaries.  So the Government is not concerned that it hid

16  the ball on anything here.

17        As to Mr. Schonfeld's request that the Court

18  unseal or the Government provide them with a redacted copy

19  of the Section 4 filing, I think it's somewhat nonsensical.

20  The unclassified information in there are probably just

21  citations to case law, which are also cited elsewhere by the

22  Government.  It would not surprise me if they got a redacted

23  document and said, "Well, Judge, we can't make any sense of

24  this, because all the meat and potatoes is redacted."  So it

25  shortly would be followed thereafter by a motion to unseal

31

1   the rest of it, and, as I've explained here, that's just not

2   how this works.  It's a nonsensical request.  The Court

3   should deny that request.

4          If the Court wants to invite defense counsel to

5   make an ex parte filing disclosing their defense strategy,

6   so be it.  The Government is not going to take a position on

7   it at this time.  The Government is confident that its

8   Section 4 motion accurately summarized the relevant and

9   helpful classified information at issue, and so the

10  Government is not afraid of any such filing.

11         THE COURT:  Anything else?  Any additional

12  comments from anyone regarding the Section 4 documents and

13  whether or not those should be opened up for review?

14         MR. CHESNOFF:  No, thank you, your Honor.

15         THE COURT:  No?

16         MR. CHESNOFF:  No, thank you, your Honor.

17         THE COURT:  That motion is denied.  However, do

18  not take that as an indication that every request to view

19  classified information that are essential or even helpful to

20  the defense would be denied.  That's not the case.

21         All right.  Anything else we need to discuss?

22         MR. SCHONFELD:  Your Honor, may I --

23         THE COURT:  Yes.

24         MR. SCHONFELD:  -- speak to our expert before Mr.

25  Chesnoff is --

32

1          THE COURT:  Sure.  Yes.

2          MR. RIGALI:  Not from the Government, your Honor.

3    Thank you.

4          THE COURT:  Okay.  Go right ahead.

5          MR. SCHONFELD:  Your Honor, there was one

6    additional thing, your Honor.  We had submitted a joint

7    request for the extension of the deadline to file a CIPA 5

8    motion --

9          THE COURT:  Go.  Go ahead.

10          MR. SCHONFELD:  -- submitted it to the Court.  It

11    hasn't been addressed yet.

12          THE COURT:  Well, unlike some of your other

13    weekend filings, I haven't seen this one, but a stipulation

14    this early in the game is fine.

15          MR. SCHONFELD:  Okay.  Thank you, your Honor.

16    We'll make sure that chambers has it.

17          THE COURT:  Yes.  You can act on it as though

18    you've got the signed copy in your hand.  Okay?  I'll do it.

19          MR. SCHONFELD:  Thank you, your Honor.

20          MR. RIGALI:  Thank you, your Honor.

21          (Proceedings concluded.)

22

23

24

25

33

1         I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Lorraine Caldwell              11/4/2024
     Transcriber                       Date
6

7    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9    /s/L.L. Francisco
     L.L. Francisco, President
10   Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25