DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
    950 Pennsylvania Avenue NW, Room B-200
    Washington, D.C. 20530
    Telephone: (771) 217-6090
    E-mail:   LJW@usdoj.gov, DEH@usdoj.gov
    E-mail:   SFM@usdoj.gov; CMR@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ALEXANDER SMIRNOV,<br><br>    Defendant. | No. CR 2:24-cr-00091-ODW<br><br>**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE FROM DEFENDANT'S FBI INTERVIEW ON SEPTEMBER 27, 2023**<br><br>Hearing Date: November 25, 2024<br>Hearing Time: 10:00 a.m.<br>Location: Courtroom of the Hon.<br>          Otis D. Wright |

Plaintiff, United States of America, by and through its counsel of record, hereby files its opposition to the Defendant's motion in limine to preclude evidence from defendant's FBI interview on September 27, 2023. ECF 149 ("Def. Mot."). In his motion,

1  the Defendant asks the Court to exclude those statements pursuant to Federal Rule of
2  Evidence 404(b) on the mistaken belief that they are "uncharged" conduct being offered
3  to "establish an adverse character trait (here, Mr. Smirnov's alleged 'dishonesty') 'for the
4  purpose of proving action in conformity therewith on a particular occasion.'" Def. Mot.
5  at 4.

6    The Defendant misunderstands the evidence and the basis for its admissibility. The
7  statements the Defendant made to the FBI are not "uncharged" conduct" nor are they being
8  offered to "establish an adverse character trait" or that he acted "in conformity with it."
9  The Defendant's statements are admissible pursuant to Federal Rule of Evidence 801(d)(2)
10 because they are an "opposing party's statement" that are "offered against the opposing
11 party." The Defendant's statements in his September 27, 2023 FBI interview are evidence
12 that his statements to the FBI on June 26, 2020, which is the conduct charged by the grand
13 jury in the indictment, were false. The Defendant fails to address or even mention Federal
14 Rule of Evidence 801(d)(2) in his motion, and, as a result, his motion and the argument he
15 advances in it is fatally flawed.

16    The Defendant further moves to exclude his 2023 statements to the FBI pursuant to
17 Federal Rule of Evidence 403 arguing that there is a "perfect 'alternative'" to the 2023
18 statements "in the statements alleged to have been made in June 2020." Def. Mot. at 8.
19 But that argument is tautological at best and nonsensical at worst. The Defendant's
20 statements in June 2020 *are* the charged conduct. The Defendant's statements on
21 September 27, 2023 are *evidence* proving the charged conduct. Charged conduct is not a
22 "perfect alternative" to *evidence* of charged conduct.  In any event, evidence of the falsity
23 of the Defendant's June 26, 2020 statements from his September 27, 2023 FBI interview
24 is not unduly prejudicial, so excluding them under Federal Rule of Evidence 403 is
25 unwarranted.

26    This motion is based upon the attached memorandum of points and authorities and
27 the declaration of Leo J. Wise, the indictment in this case, and any further evidence and
28 argument as the Court may deem necessary.

| | |
|---|---|
| Dated: November 15, 2024 | Respectfully submitted, |
| | DAVID C. WEISS<br>Special Counsel |
| | /s/_____<br>LEO J. WISE<br>Principal Senior Assistant Special Counsel |
| | DEREK E. HINES<br>Senior Assistant Special Counsel |
| | SEAN F. MULRYNE<br>CHRISTOPHER M. RIGALI<br>Assistant Special Counsels |
| | United States Department of Justice |
| | Attorneys for Plaintiff<br>UNITED STATES OF AMERICA |

# MEMORANDUM OF POINTS AND AUTHORITIES

The Defendant has moved to exclude statements he made to the FBI in an interview on September 27, 2023. *See* ECF 149 ("Def. Mot."). His motion is meritless and should be denied.

## I. The Defendant's Statements in his September 27, 2023 FBI Interview are Admissible Pursuant to Federal Rule of Evidence 801(d)(2) as Evidence that His Statement to the FBI on June 26, 2020 was False

The Defendant moves to exclude the statements he made during his September 27, 2023 FBI interview pursuant to Federal Rule of Evidence 404(b) arguing that they are "uncharged, post-hoc conduct to establish an adverse character trait (here, Mr. Smirnov's alleged 'dishonesty') 'for the purpose of proving action in conformity therewith on a particular occasion." Def. Mot. at 4. The Defendant's entire argument is based on a false premise. The statements will not be offered as "uncharged … conduct" to "establish an adverse character trait" and "conformity therewith." The Defendant's statement will be offered pursuant to Federal Rule of Evidence 801(d)(2), which provides that a statement that is an "opposing party's statement" that is "offered against an opposing party," and "was made by the party in an individual or representative capacity" is not hearsay. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000), holding modified by *United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) ("self-inculpatory statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay, see Fed. R. Evid. 801(d)(2)"); *United States v. Warren*, 25 F.3d 890, 895 (9th Cir. 1994) ("A defendant's 'own out-of-court admissions ... surmount all objections based on the hearsay rule ... and [are] admissible for whatever inferences the trial judge [can] reasonably draw'") (citing *United States v. Matlock*, 415 U.S. 164, 172 (1974)). The Defendant does not address or even mention Rule 801(d)(2) and his mistaken reliance on Rule 404(b) as the basis for his relief renders his motion meritless.

The June 26, 2020 FBI interview is the charged conduct in this case. The Defendant's statements to the FBI on September 27, 2023 are evidence that the June 26,

2020 statements were false. Simply put, the Defendant could not keep his story straight on September 27, 2023 because what he said on June 26, 2020 was a lie. The fact that the version of events he offered on September 27, 2023 was not the same one he offered on June 26, 2020 shows that.

For example, in his June 26, 2020 FBI interview, which is the false statement he is charged with making in the indictment, the Defendant claimed that he had two telephone calls with Burisma Official 1, both of which occurred during the Obama-Biden Administration, the first one in 2016 or 2017, after the U.S. presidential election but before the change in administrations, which occurred in January 2017, and a second phone call with Burisma Official 1 in 2019. ECF ¶ 35. Below is the detailed story that the Defendant told the FBI about those two phone calls on June 26, 2020:

> <u>Subsequent Telephone Calls Between CHS and [Burisma Official 1]</u>.
>
> 2016/2017 Telephone Call. Shortly after the 2016 US election and during [Public Official 2] transition period, CHS participated in a conference call with [Associate 1] and [Burisma Official 1]. CHS inquired whether [Burisma Official 1] was happy with the US election results. [Burisma Official 1] replied that he was not happy [Public Official 2] won the election. CHS asked [Burisma Official 1] **whether he was concerned about Burisma's involvement with [Public Official 1 and Businessperson 1]. [Burisma Official 1] stated he didn't want to pay the [Public Official 1 and Businessperson 1] and he was "pushed to pay" them.** (CHS explained the Russian term [Burisma Official 1] used to explain the payments was "poluchili" (transliterated by the CHS), which literally translates to got it" or "received it", but is also used in Russian-criminal-slang for being "forced or coerced to pay." [Burisma Official 1] stated [the then-Ukrainian Prosecutor General] had already been fired, and no investigation was currently going on, **and that nobody would find out about his financial dealings with the [Public Official 1 and Businessperson 1]. CHS then stated, "I hope you have some back-up (proof) for your words (namely, that [Burisma Official 1] was 'forced' to pay [Public Official 1 and Businessperson 1]). [Burisma Official 1] replied he has many text messages and "recordings" that show that he was coerced to make such payments** (See below, subsequent CHS reporting on 6/29/2020). CHS told [Burisma Official 1] he should make certain that he should retain those recordings. [Burisma Official

1] asked whether it would make any (legal) difference whether he voluntarily made such payments, or if he was "forced" to make them.

[Burisma Official 1] then asked CHS whether CHS could provide any assistance in Ukraine (with the [] regime) if something were to happen to [Burisma Official 1] in the future. CHS replied that CHS didn't want to get involved in any such matters.

[Note: See previous CHS report dated 3/1/2017 Serial 7, wherein CHS reported the foregoing, and stated the call took place during the week of 2/27/2017. At that time, CHS stated that [Burisma Official 1] briefly discussed [Businessperson 1], but the topic was not relevant to Burisma's interest in acquiring a US-based petroleum business for $50-$100 million. At this time CHS also reported aforementioned [Burisma Official 2] (alternate transliteration [Burisma Official 2]) was assigned by Burisma to manage the acquisition, and he was planning to travel to Washington, D.C. in March, 2017.

2019 Telephone call. After the aforementioned 2016 telephone call, CHS had no Interactions with [Burisma Official 1]/Burisma whatsoever, until 2019. In 2019, CHS met with [Associate 1] in London to discuss various business matters (which had nothing to do with [Burisma Official 1], Burisma, or the gas/oil industry; CHS noted that CHS's meeting with [Associate 1] took place at a "Russian coffee house near Knightsbridge Street located near Harrods department store," and that [Associate 1]'s fiancée lives in London). **At some point during this meeting, [Associate 1] advised CHS he was going to call [Burisma Official 1].** At this time, CHS understood [Burisma Official 1] was living somewhere in Europe (NFI). During the call, [Burisma Official 1] asked CHS and/or [Associate 1] if they read the recent news reports about the investigations into [Public Official 1 and Businessperson 1] and Burisma, and [Burisma Official 1] jokingly asked CHS if CHS was an "oracle" (due to CHS's prior advice that [Burisma Official 1] should not pay [Public Official 1 and Businessperson 1] and instead to hire an attorney to litigate the allegations concerning [the then-Ukrainian Prosecutor General]'s investigation). **CHS mentioned [Burisma Official 1] might have difficulty explaining suspicious wire transfers that may evidence any (illicit) payments to [Public Official 1 and Businessperson 1]. [Burisma Official 1] responded he did not send any funds directly to the "Big Guy" (which CHS understood was a reference to [Public Official 1]). CHS asked [Burisma Official 1] how many companies/bank accounts [Burisma Official 1] controls; [Burisma Official 1] responded it would take them**

3

> **(investigators) 10 years to find the records (i.e. illicit payments to [Public Official 1]).** CHS told [Burisma Official 1] if he ever needed help in the future and wanted to speak to somebody in the US government about that matter, that CHS could introduce him to someone.
>
> Regarding the seemingly open and unsolicited admissions by [Burisma Official 2] and [Burisma Official 1] about the purpose for their retention of [Businessperson 1], and the "forced" payments [Burisma Official 1] made to [Public Official 1 and Businessperson 1], CHS explained it is very common for business men in post-Soviet countries to brag or show-off. Additionally, it is extremely common for businesses in Russia and Ukraine to make **"bribe" payments** to various government officials. CHS noted that in corporate budgets for other Russian and Ukrainian businesses which CHS has inspected in the past, CHS observed budget-line-items in Russian called "Podmazat" (transliterated by CHS), which literally translates to "oil, lubricate, or make things run smoothly," which companies routinely use to account for anticipated **bribe payments**. As such, given the pervasive necessity to **bribe government officials** in Ukraine and Russia, CHS did not perceive [Burisma Official 2]'s or [Burisma Official 1]'s statements to be unusual, self-serving, or pretextual. Additionally, regarding important business meetings, it is also common in Ukraine and Russia for persons to make covert recordings. However, CHS has only met [Burisma Official 1] in person on one occasion and has spoken to him only twice on the telephone; as such, CHS is not able to provide any further opinion as to the veracity of [Burisma Official 1]'s aforementioned statements.

ECF 1 ¶ 35. (emphases added).

In his September 27, 2023 FBI interview, the Defendant told the FBI that he "did not have any phone calls with [Businessperson 1] after their second meeting." The fact that the Defendant said in his September 27, 2023 FBI interview that he did not have any phone calls with Burisma Official 1 after their second meeting is proof that his June 26, 2020 statements about these phone calls with Burisma Official 1 were false.

Similarly, in his September 27, 2023 FBI interview, the Defendant's recounting of his two meetings with Burisma officials also departed from the version of those two meetings he gave the FBI in his interview on June 26, 2020, which is the false statement

4

charged in the indictment. The different version he offered on September 27, 2023 of those two meetings is also evidence that his June 26, 2020 story was false.

For example, on June 26, 2020, the Defendant told the FBI that during his first meeting with Burisma officials, the one in Kiev, Burisma Official 2 told the Defendant that they had "hired [Businessperson 1] to 'protect us, through his dad, from all kinds of problems.'" ECF 1 ¶ 26. In his September 27, 2023 FBI interview, the Defendant did not repeat this explosive claim, which implicated the sitting Vice President of the United States in a bribery scandal. Instead, the Defendant changed his story and said only that Burisma Official 2 said something to the effect of "I am paying enough for familia," without referencing the Vice President or even which "familia" he was referring to (the Defendant explained that "familia" was a reference to "family or a last name.").

Similarly, on June 26, 2020, the Defendant told the FBI that his second meeting with Burisma officials in Vienna, Austria, was witnessed by Associate 1. ECF 1 ¶ 26. During his September 27, 2023 interview, the Defendant told the FBI that his second meeting was just between himself and Burisma Official 1, thus eliminating any witnesses who could contradict him.

In his September 27, 2023 FBI interview, the Defendant told the FBI, for the first time, that in addition to the two meetings and two phone calls he described in great detail, he actually met with the Ukrainian Prosecutor General whom the Defendant claimed Burisma Officials 1 and 2 were bribing Public Official 1 to get fired. The Defendant told the FBI on September 27, 2023, that this meeting occurred between his two meetings with Burisma officials. Most remarkably, the Defendant claimed in his September 27, 2023 interview that this meeting had been arranged by the then-President of Ukraine and that the Defendant subsequently met with the then-President of Ukraine himself to discuss the meeting. The fact that the Defendant's version of events in June 2020 did not include these two meetings, one with the Prosecutor General who the Defendant claimed Burisma Officials 1 and 2 said they were bribing Public Official 1 to get fired, and one with the

then-President of Ukraine, is further evidence that what he told the FBI in June 2020 is false.

## II. The New Story the Defendant Volunteered During his September 27, 2023 FBI Interview is Inextricably Intertwined with the Charged Conduct and Thus Admissible

In his September 27, 2023 FBI interview the Defendant also offered a new story implicating Public Official 1's son, Businessperson 1, and, by his telling, likely implicating Public Official 1 himself. On September 27, 2023, the Defendant

> … wanted investigators to know they should look into whether [Businessperson 1] was recorded while on the 8th floor of the Premier Palace [in Kiev]. The entire hotel is wired and under the control of the Russians and especially the 8th floor which is a place to pay women for sex … [Businessperson 1] went to the Premier Palace many times and the [the Defendant] has seen footage of [Businessperson 1] entering the Premier Palace. The CHS suggested the interviewing personnel check to see if [Businessperson 1] made telephone calls from the Premier Palace since those calls would have been recorded by the Russians.

That story is evidence of the Defendant's motive and intent and falls outside of Federal Rule of Evidence 404(b) as well. "Evidence of 'other acts' is not subject to Rule 404(b) analysis if it is 'inextricably intertwined' with the charged offense." *United States v. Beckman*, 298 F.3d 788, 793 (9th Cir. 2002). "This exception applies when (1) particular acts of the defendant are part of ... a single criminal transaction,' or when (2) 'other act' evidence ... is necessary [to admit] in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Wells*, 879 F.3d 900, 928 (9th Cir. 2018) (internal citation marks omitted). Here both circumstances under which the intrinsic evidence exception to Rule 404(b) applies are present. As evidenced by his messages with his FBI Handler in May 2020, leading up to his interview in June 2020, the Defendant harbored deep animosity towards the candidacy of Public Official 1 for President of the United States. ECF 1 ¶¶ 8-21. The fact that he volunteered a new story to potentially implicate Public Official 1, who in September 2023

6

was again a candidate for President of the United States, is both part of the same "criminal transaction," namely an attempt to influence the U.S. presidential election in a manner detrimental to Public Official 1, and also is necessary to present a "coherent and comprehensible story regarding the commission of the crime" charged. *Wells*, 879 F.3d at 928. "Courts look to both temporal proximity and substantive similarly when determining that evidence is inextricably intertwined." *United States v. Sims*, 550 F. Supp. 3d 907, 912 (D. Nev. 2021) (citing *United States v. Rrapi*, 175 F.3d 742, 750 (9th Cir. 1999)) (evidence of prior uncharged burglaries was "inextricably intertwined" with charged crimes where uncharged burglaries were obtained during period of government surveillance, involved similar pattern of conduct, and occurred close in time to charged crimes). Here, there is temporal proximity between the Defendant's two statements—both occurred during presidential elections and only three years apart—and are substantively similar, precisely because both show bias against Public Official 1.

### III. The Defendant's September 27, 2023 FBI Interview Statements are Not Unduly Prejudicial and Thus are Admissible

The Defendant's argument that his statements during the September 27, 2023 FBI interview should be excluded pursuant to Federal Rule of Evidence 403 is similarly unavailing. The Defendant asserts that the statements he made during his June 26, 2020 FBI interview are "perfect alternatives," to his September 27, 2023 statements. Def. Mot. at 8. This argument is tautological at best and nonsensical at worst. The June 26, 2020 statement he made to the FBI is the conduct that is charged in the indictment. The statements he made in the September 27, 2023 FBI interview are evidence that the charged statement was false. Rule 403 provides that, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here the probative value of the Defendant's September 27, 2023 FBI interview statements is high. They prove his statement to the

FBI in June 2020, the charged conduct in this case, was false. The September 27, 2023 FBI interview statements are not *unduly* prejudicial. As the Ninth Circuit explained,

> Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quoting *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983)). Surprisingly, while maintaining his innocence, the Defendant concedes that "there does exist evidence (both testimonial and documentary) tending to prove that Mr. Smirnov made those charged statements in 2020, which are facts 'of consequence; and, therefore, relevant." Def. Mot. at 8. His statements in the September 27, 2023 FBI interview are among that evidence. For that reason, they should not be excluded under Rule 403.

### IV. Conclusion

For these reasons, the Court should deny the Defendant's motion in limine seeking to preclude his statements during the September 27, 2023 FBI interview.