F I L E D
CLERK, U.S. DISTRICT COURT

2/14/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2023 Grand Jury

UNITED STATES OF AMERICA,

      Plaintiff,

        v.

ALEXANDER SMIRNOV,

      Defendant.

No.  2:24-cr-00091-ODW

I N D I C T M E N T

[18 U.S.C. § 1001: false statement; 18 U.S.C. § 1519: creating a false and fictitious record]

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

1.   Defendant ALEXANDER SMIRNOV was a resident of Los Angeles, California in 2020.

A. The Defendant was an FBI Confidential Human Source.

2.   The Defendant was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI").  As a CHS, the Defendant was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law.

3.    As a CHS, the Defendant provided information to the Handler that was then used in various criminal investigations conducted by the FBI.  The Defendant knew that information he provided was used in criminal investigations because, among other reasons, the Handler advised him that he might have to testify in court based on the information he provided on multiple occasions, including, but not limited to: 10/1/2010, 5/17/2011, 11/28/2012, 04/12/2013, 8/29/2013, 7/10/2015 and 3/11/2020.  The Defendant also knew the information he provided was used in criminal investigations because the Defendant participated in a number of operations where he was authorized to engage in criminal activity as part of an on-going criminal investigation.

4.    The Defendant was admonished by the Handler that he must provide truthful information to the FBI when he first became a CHS in 2010 and on multiple occasions thereafter, including, but not limited to: 10/1/2010, 1/20/2011, 5/17/2011, 9/14/2011, 8/29/2012, 11/28/2012, 4/12/2013, 8/29/2013, 1/22/2014, 7/9/2014, 7/10/2015, 9/29/2016, 9/26/2017, 9/26/2018, 9/27/2019, 3/11/2020, 2/19/2021, 10/28/2021, 10/17/2022 and 9/29/2023.

5.    In addition, when the Defendant was authorized to engage in illegal activity for investigative purposes, he was further admonished that: "Under no circumstances may the CHS … Participate in an act that constitutes obstruction of justice (e.g., perjury, witness tampering, witness intimidation, entrapment, or fabrication, alteration, or destruction of evidence, unless such illegal activity has been authorized)."  When the Defendant was given this admonishment, he signed an FBI form that contained this statement, including on 10/8/2014, 1/18/2017, 10/8/2018, 1/10/2019, and 8/7/2020.

6.    Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, the Defendant provided false derogatory information to the FBI about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1, in 2020, after Public Official 1 became a candidate for President of the United States of America.

a.    As described in greater detail below, in March 2017, the Defendant reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange.  In reporting that conversation to the Handler, the Defendant also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known.

b.    Three years later, in June 2020, the Defendant reported, for the first time, two meetings in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]."

1    c.   The Defendant also reported two purported phone calls

2  between himself and Burisma Official 1 wherein Burisma Official 1

3  stated that he had been forced to pay Public Official 1 and

4  Businessperson 1 and that it would take investigators 10 years to find

5  records of illicit payments to Public Official 1.

6    d.   As alleged herein, the events the Defendant first

7  reported to the Handler in June 2020 were fabrications.  In truth and

8  fact, the Defendant had contact with executives from Burisma in 2017,

9  after the end of the Obama-Biden Administration and after the then-

10  Ukrainian Prosecutor General had been fired in February 2016, in other

11  words, when Public Official 1 had no ability to influence U.S. policy

12  and when the Prosecutor General was no longer in office.  In short,

13  the Defendant transformed his routine and unextraordinary business

14  contacts with Burisma in 2017 and later into bribery allegations

15  against Public Official 1, the presumptive nominee of one of the two

16  major political parties for President, after expressing bias against

17  Public Official 1 and his candidacy.

18    e.   When he was interviewed by FBI agents in September 2023,

19  the Defendant repeated some of his false claims, changed his story as

20  to other of his claims, and promoted a new false narrative after he

21  said he met with Russian officials.

22  B. In 2017, the Defendant provided the FBI Handler with information

23    that Burisma was interested in acquiring an American oil and gas

24    company.

25    7.   On or about March 1, 2017, the Defendant provided information

26  to the Handler concerning Burisma for the first time.  That information

27  was memorialized in an official record of the FBI on a Form 1023

28  (hereafter the "2017 1023").  The following is the entirety of what

4

the Defendant told the Handler in March 2017 that was memorialized in
the 2017 1023:

> During the week of 2/27/2017, CHS received a telephone call
> from [Associate 1] (a subject of prior CHS reporting
> regarding ties to ROC). Also on the call was [Burisma
> Official 1], whom CHS understood is the "CEO or owner" of
> Burisma Holdings - Ukraine. During the call, [Associate 1]
> mentioned they are interested in acquiring a U.S.-based
> petroleum business with a market capitalization between $50-
> $100 million. They would then use this US-based entity as
> the parent company for Burisma Holdings (or a subdivision
> thereof), which they would then seek to register on a US
> exchange.
>
> This CEO and [Associate 1] made statements that led CHS to
> believe that Burisma Holdings has overstated its corporate
> assets in various public filings in Ukraine (NFI).
>
> The individual in Ukraine who is currently assigned to manage
> this acquisition is [Burisma Official 2], whose title is
> "Board Advisor - Director for International Cooperation and
> Strategic Development", email [] @burisma.com, 10-A Ryleyeva
> Str., Kyiv 04073, Ukraine, office phone [], fax: []. During
> the week of March 6, 2017, [Burisma Official 2] plans to
> travel to Washington D.C. (NFI), and may meet with the CHS
> sometime thereafter on the West Coast.
>
> **During this call, there was a brief, non-relevant discussion
> about [Public Official 1]'s son, [Businessperson 1], who is
> currently on the Board of Directors for Burisma Holdings [No
> Further Information].**

(emphasis added).  Notably, the Defendant did not report in 2017 that
in the preceding two years, Burisma Official 1 admitted to the Defendant
that he had paid Public Official 1 $5 million when Public Official 1
was still in office, as the Defendant later claimed.

C. Three years later, in May 2020, the Defendant sent the Handler a series of messages expressing bias against Public Official 1, who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major political parties.

8.    On May 19, 2020, the Defendant messaged the Handler the following:



9.    On that day, May 19, 2020, it was publicly reported that:

A Ukrainian lawmaker who met with [] late last year released recordings of private phone calls several years ago between [Public Official 1] and [], then Ukraine's president, in a new broadside against the presumptive [] nominee for U.S. president that has raised questions about foreign interference in the 2020 election.

10.   Approximately 20 minutes after his first message on May 19, 2020, the Defendant volunteered his view that:

Public Official 1 going to jail ))))     5:56 PM

11.   One minute later, the Defendant opined:

May 19, 2020

Dems tried to impeacn Public Official 2 for same     5:57 PM

Even less     5:57 PM

All those polititions same shit     5:57 PM

Jail for all of them     5:57 PM

Plus bribe of Public Official 1 should be soon in the news)))     5:57 PM

12.   To which the Handler responded:

> ???  Only if you believe that his request to get rid of [Prosecutor General] was only because of Burisma...which my all accounts it was not
>
> 5:58 PM ✓✓

13.   The Defendant offered the following:

> For sure yes  5:58 PM
>
> I'll try to prove it for you bro
> 5:58 PM

14.   To which the Handler responded:

> Bride payment to [Public Official 1] Or are you talking about the aid withheld unless they fired [Prosecutor General] 5:59 PM ✓✓

15.    The Defendant then further offered the following:




16.    To which the Handler responded:



17.    The Defendant then stated:

The Defendant did not indicate who "the guys" were.

[this space intentionally left blank]

9

18.  The following day, May 20, 2020, the Defendant messaged the Handler a link to an article titled, "Senate Republicans issue first subpoena in [Public Official 1]-Burisma probe":



19.  The Handler did not respond.

[this space intentionally left blank]

20.  The next day, May 21, 2020, the Defendant messaged the Handler the following:



[this space intentionally left blank]

21. Less than thirty minutes later, the Defendant messaged the Handler the following:



Contrary to the Defendant's representation, this was not, in fact, a photograph of Public Official 1 and Businessperson 1 with the CEO of Burisma.

   D. One month later, and three years after first reporting on Burisma, the Defendant reported bribery allegations against Businessperson 1 and Public Official 1.

   22.  In June 2020, the Handler reached out to the Defendant concerning the 2017 1023.  This was done at the request of the FBI's Pittsburgh Field Office (hereafter "FBI Pittsburgh").  In the first half of 2020, the United States Attorney's Office for the Western District of Pennsylvania (hereafter "USAO WDPA") had been tasked by the Deputy Attorney General of the United States to assist in the "receipt, processing, and preliminary analysis of new information provided by the public that may be relevant to matters relating to Ukraine."  As part of that process, FBI Pittsburgh opened an assessment, 58A-PG-3250958, and in the course of that assessment identified the 2017 1023 in FBI holdings and shared it with USAO WDPA.  USAO WDPA then asked FBI Pittsburgh to reach out to the Handler to ask for any further information about the reference in his 2017 1023 that stated, "During this call, there was a brief, non-relevant discussion about former [Public Official 1]'s son, [Businessperson 1], who is currently on the Board of Directors for Burisma Holdings [No Further Information]".

   23.  On or about June 26, 2020, FBI Pittsburgh contacted the Handler regarding the 2017 1023.  That same day, the Handler spoke with the Defendant, who was in Los Angeles, by telephone.  The information the Defendant provided the Handler was memorialized on a Form 1023 (hereafter the "2020 1023"), an official record of the FBI, which was finalized on June 30, 2020.

24.     During their call on June 26, 2020, when the Handler asked the Defendant about the "brief, non-relevant discussion about former [Public Official 1]'s son, [Businessperson 1], who is currently on the Board of Directors for Burisma Holdings," the Defendant described, for the first time, two purported meetings and two purported phone calls with various Burisma executives where Businessperson 1 and Public Official 1 were discussed.   The two phone calls were in addition to the one the Defendant reported on in the 2017 1023.   This time, rather than a passing reference to Businessperson 1 being on Burisma's Board, the Defendant claimed that Burisma executives at two meetings in 2015 and/or 2016, during the Obama-Biden Administration, told him that they were paying Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1, when he was in office, and Businessperson 1 so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with" the then-Ukrainian Prosecutor General.   In describing the phone calls, the Defendant claimed that Burisma Official 1 said he was "pushed to pay" Public Official 1 and Businessperson 1, had text messages and recordings that show he was coerced to make such payments, and it would take investigators ten years to find the records of illicit payments to Public Official 1.   The Defendant made these statements to the Handler in June 2020, when Public Official 1 was a candidate for President of the United States and the presumptive nominee of one of the two major political parties.

25.     Critically, the payments the Defendant described occurred, according to the Defendant, during the Obama-Biden Administration in

2016, when Public Official 1 was in a position to influence U.S. policy towards Ukraine, and prior to February 2016 when the then-Ukrainian Prosecutor General was fired and, in any event, prior to the change in Administrations in January 2017.

26. Specifically, the Defendant claimed the following about the first and second meetings:

> First Meeting with Burisma Executives in Kyiv, Ukraine 2015/2016. **In late 2015 or 2016, during the Obama/Biden administration, CHS was first introduced to officials at Ukraine natural gas business Burisma Holdings ("Burisma") through CHS's associate, [Associate 1]** (alternate transliteration - [Associate 1]; for full identification of [Associate 1], see attachments to [], a FD-1023 by CHS serialized on 1/2/2018).

> CHS and [Associate 1] traveled to Ukraine and went to Burisma's office that was located 20 minutes away from the City Center. The purpose of the meeting was to discuss Burisma's interest in purchasing a US-based oil and gas business, for purposes of merging it with Burisma for purposes of conducting an IPO in the US. Burisma was willing to purchase a US-based entity for $20-30 million.

> **At this meeting was CHS, CHS's former business partner, [Associate 2] (an USPER who does not speak Russian), [Associate 1], Burisma's CFO, [Burisma Official 2]** (email []@Burisma.com, telephone []), **[Burisma Official 3] (the daughter to Burisma's CEO and founder [Burisma Official 1) and her husband (FNU LNU).** The conversation was in Russian, and thus [Associate 2] did not participate therein.

> During the meeting, [Burisma Official 2] asked CHS whether CHS was aware of Burisma's Board of Directors. CHS replied "no", and [Burisma Official 2] advised the board members included: 1) the former President or Prime Minister of Poland; and, 2) **[Public Official 1]'s son, [Businessperson 1].** [Burisma Official 2] said Burisma hired the former President or Prime Minister of Poland to leverage his contacts in Europe for prospective oil and gas deals, **and they hired [Businessperson 1] to "protect us, through his dad, from all kinds of problems"** (CHS was certain [Burisma Official 2] provided no further/specific details about what that meant).

15

CHS asked why they (Burisma) needed to get CHS's assistance regarding the purchase/merger of a US-based company when [Businessperson 1] was on their board. [Burisma Official 2] replied that [Businessperson 1] was not smart, and they wanted to get additional counsel. The group then had a general conversation about whether the purchase/merger with a US company would be a good business decision.

Meeting with CHS, [Associate 1], and [Burisma Official 1] in Vienna, Austria in 2016. **Approximately one or two months after the aforementioned Burisma meeting in Ukraine, CHS traveled to Vienna, Austria with [Associate 1] and met with [Burisma Official 1] at an outside coffee shop.** The trio continued to talk about the feasibility of Burisma acquiring a US-based entity. **CHS recalled this meeting took place around the time [Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office.** CHS told [Burisma Official 1] that **due to [the then-Ukrainian Prosecutor General]'s investigation into Burisma,** which was made public at this time, **it would have a substantial negative impact on Burisma's prospective IPO in the United States. [Burisma Official 1] replied something to the effect of, "Don't worry [Businessperson 1] will take care of all of those issues through his dad."** CHS did not ask any further questions about what that specifically meant.

CHS asked [Burisma Official 1] why Burisma would pay $20-30 million to buy a US company for IPO purposes when it would be cheaper to just form a new US-entity, or purchase a corporate shell that was already listed on an exchange. [Burisma Official 1] responded that [Businessperson 1] advised Burisma it could raise much more capital if Burisma purchased a larger US-based business that already had a history in the US oil and gas sector. CHS recalled [Burisma Official 1] mentioned some US-based gas business(es) in Texas, the names of which CHS did not recall. **CHS advised [Burisma Official 1] it would be problematic to raise capital in the US given [the then-Ukrainian Prosecutor General]'s investigation into Burisma as nobody in the US would invest in a company that was the subject of a criminal investigation.** CHS suggested it would best if Burisma simply litigate the matter in Ukraine, and pay some attorney $50,000. [Burisma Official 1] said he/Burisma would likely lose the trial because he could not show that Burisma was innocent; [Burisma Official 1] also laughed at CHS's number of $50,000 (not because of the small amount, but because the number contained a "5") **and said that "it cost 5 (million) to pay [Public Official 1], and 5 (million) to**

16

**[Businessperson 1].**" CHS noted that at this time, it was unclear to CHS whether these alleged payments were already made.

CHS told [Burisma Official 1] that **any such payments to [Public Official 1 and Businessperson 1]** would complicate matters, and Burisma should hire "some normal US oil and gas advisors" because [Public Official 1 and Businessperson 1] have no experience with that business sector. [Burisma Official 1] made some comment that although [Businessperson 1] "was stupid, and his ([Burisma Official 1]'s) dog was smarter," **[Burisma Official 1] needed to keep [Businessperson 1] (on the board) "so everything will be okay." CHS inquired whether [Businessperson 1] or [Public Official 1] told [Burisma Official 1] he should retain [Businessperson 1]; [Burisma Official 1] replied, "They both did."** CHS reiterated CHS's opinion that [Burisma Official 1] was making a mistake and he should fire [Businessperson 1] and deal with [**the then-Ukrainian Prosecutor General]'s investigation** directly so that the matter will remain an issue in Ukraine, and not turn in to some international matter. [Burisma Official 1] responded something to the effect of, **"Don't worry, this thing will go away anyway."** CHS replied that, notwithstanding [the then-Ukrainian Prosecutor General]'s investigation, it was still a bad decision for Burisma to spend $20-$30 million to buy a US business, and that CHS didn't want to be involved with the [Public Official 1 and Businessperson 1] matter. [Burisma Official 1] responded that he appreciated CHS's advice, but that "it's too late to change his decision." **CHS understood this to mean that [Burisma Official 1] had already had [sic.] paid [Public Official 1 and Businessperson 1], presumably to "deal with [the then-Ukrainian Prosecutor General]."**

(emphases added).

E. The Defendant's 2020 story was a fabrication.

27. The Defendant's claim that "in late 2015/2016 during the Obama/Biden Administration" he first met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems" was false, as he knew.

28.  Similarly, the Defendant's claims that he met with Burisma Official 1 "one or two months later," around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million each so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with [the then-Ukrainian Prosecutor General]," were false, as the Defendant knew.

29.  No such statements were made to the Defendant because, in truth and fact, Defendant met with officials from Burisma for the first time in 2017, *after* Public Official 1 left office in January 2017, and *after* the then-Ukrainian Prosecutor General had been fired in February 2016.  The first meeting the Defendant had with officials from Burisma occurred at a time when Public Official 1 no longer had the ability to influence U.S. policy and after the then-Ukrainian Prosecutor General was out of office.  The Defendant's story to the FBI was a fabrication, an amalgam of otherwise unremarkable business meetings and contacts that had actually occurred but at a later date than he claimed and for the purpose of pitching Burisma on the Defendant's services and products, not for discussing bribes to Public Official 1 when he was in office.

30.  The Defendant began to pursue business opportunities with Burisma in spring 2017, at the earliest, through two associates of his.

a.  Associate 1 was a Ukrainian business consultant.  He was introduced to the Defendant by a mutual acquaintance who told

Associate 1 that the Defendant was an expert in IPOs in the United States. The Defendant and Associate 1 subsequently met in Kiev, Ukraine, and the Defendant asked Associate 1 to connect him to businesses in Ukraine interested in IPOs in the United States. Associate 1 subsequently identified Burisma as such a company.

b. Associate 2 was an American who owned a cryptocurrency business. In the spring of 2017, the Defendant presented Burisma to Associate 2 as a company that might be interested in a cryptocurrency product Associate 2 was trying to commercialize. Around this time, the Defendant sent Associate 2 a link to the Board of Directors of Burisma. The Defendant specifically called out the fact that Businessperson 1 was on the Board and indicated that because Businessperson 1 was on the Board, the Defendant thought Burisma was a company with which they could do business.

31. Between March 2017, when the Defendant first reported on Burisma to the Handler, and June 2020, when he first made his false claims about bribes paid to Public Official 1 when he was in office, directly and through his son Businessperson 1, the Defendant had a series of routine business contacts with executives at Burisma. All of these contacts occurred in 2017 and 2018, when Public Official 1 was out of office and after the then-Ukrainian Prosecutor General had been fired. Specifically:

a.    The same day that he first reported on Burisma, March 1, 2017, the Defendant messaged the Handler a photograph of a business card for Burisma Official 2.



b.    In response, on that same day, the Handler asked the Defendant, "How's [Burisma Official 2] fit into the story", to which the Defendant responded, "This is the guy that will do the public company from there [sic.] side."

c.    The Handler then messaged the Defendant, "Looks like the CEO or Owner might be [Burisma Official 1] or []. Either sound familiar?", to which the Defendant responded with the first name of Burisma Official 1.  The Handler then asked the Defendant whether he was meeting with Burisma Official 1, to which the Defendant responded, "No.  The guy that I send [sic.] you the business card."

d.    On April 13, 2017, the Handler messaged the Defendant asking him, "U know who from Burisma will be in the meeting," to which

1  the Defendant responded, "Not yet Will know after we [sic.] I will get
2  the email."

3          e.    Four days later, on April 17, 2017, Associate 1 sent
4  the Defendant and Burisma Official 2 an email introducing them to each
5  other.

6          f.    That same day, Associate 1 sent another email to Burisma
7  Official 2 summarizing, in general terms, how a company could undertake
8  an IPO in the United States.

9          g.    On or about April 27, 2017, Burisma Official 2 responded
10 to Associate 1's April 17, 2017, email.  Burisma Official 2 thanked
11 Associate 1 for introducing him to the Defendant and promised to send
12 the Defendant and Associate 1 information about Burisma's desire to
13 buy an oil and gas company in the United States.

14         h.    On or around May 11, 2017, Burisma Official 4, another
15 Burisma executive, emailed Associate 1 telling him that Burisma was
16 not interested in pursuing an IPO in the United States and that their
17 priority was acquiring a U.S.-based oil and gas company.

18         i.    Seven days later, on or about May 18, 2017, Associate 1
19 forwarded Burisma Official 3's email to the Defendant.

20         j.    On July 24, 2017, the Defendant messaged the Handler,
21 "Cutting a deal with Burisma  Will update you soon bro" and "It's gonna
22 be a contract so we can review it first."

23         k.    On September 16, 2017, Associate 2, the individual whom
24 the Defendant claimed in the 2020 1023 attended the first meeting the
25 Defendant had with Burisma executives in late 2015 or 2016, flew from
26 New York to Kiev, via London.  Associate 2 remained in Ukraine until
27 September 23, 2017, when he returned to the United States through
28 London.

21

1    l.   During the six (6) day period that Associate 2 was in

2 Ukraine, he and the Defendant met with representatives from Burisma,

3 including Burisma Official 3, the daughter of Burisma's owner Burisma

4 Official 1, to discuss a cryptocurrency product.   The meeting was in

5 Russian, and on the drive back from Burisma's headquarters, the

6 Defendant described to Associate 2 what had been discussed.     The

7 Defendant told Associate 2 that the Burisma representatives were not

8 interested in the cryptocurrency product the Defendant and Associate 2

9 were selling and were instead trying to find an oil and gas company in

10 the United States that Burisma could purchase.   The Defendant did not

11 describe to Associate 2 any discussion of Businessperson 1 or Public

12 Official 1 during this meeting.

13    m.   On September 19, 2017, the Defendant messaged the

14 Handler photographs of business cards for Burisma Official 3, the



24 person the Defendant claimed he met at the first meeting in late 2015

25 or 2016 during the Obama-Biden Administration, and Burisma Official 4,

26 the individual who had sent an email to Associate 1, which Associate 1

27 then forwarded to the Defendant, in May 2017, as described above.

28

n.   After the September 2017 meeting, Associate 2 prepared a document outlining steps that Burisma could take in order to acquire a company in the United States and use it for an IPO.  Associate 2 sent this document to the Defendant on September 22, 2017.

o.   Associate 2's trip to Kiev in September 2017 was the first time he had left North America since 2011.  Thus, he could not have attended a meeting in Kiev, as the Defendant claimed, in late 2015 or 2016, during the Obama-Biden Administration.  His trip to Ukraine in September 2017 was more than seven months after Public Official 1 had left office and more than a year after the then-Ukrainian Prosecutor General had been fired.

p.   On January 23, 2018, Associate 2 flew from Los Angeles to London.  During the previous week, on January 16, 2018, the Defendant messaged Associate 2 asking him, "Brother Send me the name of the place in London please," to which Associate 2 replied, "Baglioni."  On January 25, 2018, the Defendant attempted to call Associate 2.  Associate 2 responded, "Downstairs getting breakfast," and the Defendant responded, "Cool.  See you in a few."  Both the Defendant and Associate 2 were staying at the Hotel Baglioni in London at that time.  When Associate 2 was with the Defendant in London, the Defendant told Associate 2 that he had received a call from the owner of Burisma, Burisma Official 1, and that Burisma Official 1 was interested in doing business with them.

q.   On January 26, 2018, Associate 2 flew from London to Kiev, staying until January 30, 2018.

r.   During that five (5) day time period, the Defendant and Associate 2 traveled to Burisma's headquarters.  Once there, they had a brief meeting with Burisma Official 2, who told them that Burisma was not interested in their cryptocurrency product.  Burisma Official

2 spoke English during the meeting, and Associate 2 was able to participate.  At no point during this meeting between the Defendant, Associate 2, and Burisma Official 2 did Burisma Official 2 tell the Defendant that Burisma had hired Businessperson 1 to "protect us, through his dad, from all kinds of problems."

32.  As described above, all the contacts that the Defendant had with Burisma occurred no earlier than spring 2017, after the end of the Obama-Biden Administration.  Notably, the Defendant was only introduced to Burisma Official 2, via email, on or about April 17, 2017.  Therefore, the Defendant's claim that he had met with Burisma Official 2 in "late 2015 or 2016, during the Obama/Biden administration," was false because if the Defendant had met Burisma Official 2 then, he would not have needed Associate 1 to introduce him to Burisma Official 2 in April 2017, and Burisma Official 2 would not have thanked Associate 1 for introducing them in April 2017.

33.  As to the second meeting, the one that supposedly happened in Vienna, contrary to what the Defendant told the Handler, Associate 1 did not meet with the Defendant and Burisma Official 1 at a café in Vienna around the time that Public Official 1 "made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015.  In fact, Associate 1 has <u>never</u> met or spoken with Burisma Official 1.

34.  Further, the Defendant did not travel to Vienna "around the time [Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015.

35.   When the Handler interviewed the Defendant on June 26, 2020, the Defendant also falsely told the Handler that he had two phone calls with Burisma Official 1, one in "2016/2017" shortly after the U.S. election but before the end of the Obama-Biden Administration and a second one in 2019.   The following is what the Defendant told the Handler about those two calls that was also memorialized in the 2020 1023:

Subsequent Telephone Calls Between CHS and [Burisma Official 1].

2016/2017 Telephone Call. Shortly after the 2016 US election and during [Public Official 2] transition period, CHS participated in a conference call with [Associate 1] and [Burisma Official 1]. CHS inquired whether [Burisma Official 1] was happy with the US election results. [Burisma Official 1] replied that he was not happy [Public Official 2] won the election. CHS asked [Burisma Official 1] **whether he was concerned about Burisma's involvement with [Public Official 1 and Businessperson 1]. [Burisma Official 1] stated he didn't want to pay the [Public Official 1 and Businessperson 1] and he was "pushed to pay"** them. (CHS explained the Russian term [Burisma Official 1] used to explain the payments was "poluchili" (transliterated by the CHS), which literally translates to got it" or "received it", but is also used in Russian-criminal-slang for being "forced or coerced to pay." [Burisma Official 1] stated [the then-Ukrainian Prosecutor General] had already been fired, and no investigation was currently going on, **and that nobody would find out about his financial dealings with the [Public Official 1 and Businessperson 1]. CHS then stated, "I hope you have some back-up (proof) for your words (namely, that [Burisma Official 1] was 'forced' to pay [Public Official 1 and Businessperson 1]). [Burisma Official 1] replied he has many text messages and "recordings" that show that he was coerced to make such payments** (See below, subsequent CHS reporting on 6/29/2020). CHS told [Burisma Official 1] he should make certain that he should retain those recordings. [Burisma Official 1] asked whether it would make any (legal) difference whether he voluntarily made such payments, or if he was "forced" to make them.

[Burisma Official 1] then asked CHS whether CHS could provide any assistance in Ukraine (with the [] regime) if something

25

were to happen to [Burisma Official 1] in the future. CHS
replied that CHS didn't want to get involved in any such
matters.

[Note: See previous CHS report dated 3/1/2017 Serial 7,
wherein CHS reported the foregoing, and stated the call took
place during the week of 2/27/2017. At that time, CHS stated
that [Burisma Official 1] briefly discussed [Businessperson
1], but the topic was not relevant to Burisma's interest in
acquiring a US-based petroleum business for $50-$100 million.
At this time CHS also reported aforementioned [Burisma
Official 2] (alternate transliteration [Burisma Official 2])
was assigned by Burisma to manage the acquisition, and he
was planning to travel to Washington, D.C. in March, 2017.

2019 Telephone call. After the aforementioned 2016 telephone
call, CHS had no Interactions with [Burisma Official
1]/Burisma whatsoever, until 2019. In 2019, CHS met with
[Associate 1] in London to discuss various business matters
(which had nothing to do with [Burisma Official 1], Burisma,
or the gas/oil industry; CHS noted that CHS's meeting with
[Associate 1] took place at a "Russian coffee house near
Knightsbridge Street located near Harrods department store,"
and that [Associate 1]'s fiancée lives in London). **At some
point during this meeting, [Associate 1] advised CHS he was
going to call [Burisma Official 1].** At this time, CHS
understood [Burisma Official 1] was living somewhere in
Europe (NFI). During the call, [Burisma Official 1] asked
CHS and/or [Associate 1] if they read the recent news reports
about the investigations into [Public Official 1 and
Businessperson 1] and Burisma, and [Burisma Official 1]
jokingly asked CHS if CHS was an "oracle" (due to CHS's prior
advice that [Burisma Official 1] should not pay [Public
Official 1 and Businessperson 1] and instead to hire an
attorney to litigate the allegations concerning [the then-
Ukrainian Prosecutor General]'s investigation). **CHS
mentioned [Burisma Official 1] might have difficulty
explaining suspicious wire transfers that may evidence any
(illicit) payments to [Public Official 1 and Businessperson
1]. [Burisma Official 1] responded he did not send any funds
directly to the "Big Guy" (which CHS understood was a
reference to [Public Official 1]). CHS asked [Burisma
Official 1] how many companies/bank accounts [Burisma
Official 1] controls; [Burisma Official 1] responded it would
take them (investigators) 10 years to find the records (i.e.
illicit payments to [Public Official 1]).** CHS told [Burisma
Official 1] if he ever needed help in the future and wanted
to speak to somebody in the US government about that matter,
that CHS could introduce him to someone.

Regarding the seemingly open and unsolicited admissions by [Burisma Official 2] and [Burisma Official 1] about the purpose for their retention of [Businessperson 1], and the "forced" payments [Burisma Official 1] made to [Public Official 1 and Businessperson 1], CHS explained it is very common for business men in post-Soviet countries to brag or show-off. Additionally, it is extremely common for businesses in Russia and Ukraine to make **"bribe" payments** to various government officials. CHS noted that in corporate budgets for other Russian and Ukrainian businesses which CHS has inspected in the past, CHS observed budget-line-items in Russian called "Podmazat" (transliterated by CHS), which literally translates to "oil, lubricate, or make things run smoothly," which companies routinely use to account for anticipated **bribe payments.** As such, given the pervasive necessity to **bribe government officials** in Ukraine and Russia, CHS did not perceive [Burisma Official 2]'s or [Burisma Official 1]'s statements to be unusual, self-serving, or pretextual. Additionally, regarding important business meetings, it is also common in Ukraine and Russia for persons to make covert recordings. However, CHS has only met [Burisma Official 1] in person on one occasion and has spoken to him only twice on the telephone; as such, CHS is not able to provide any further opinion as to the veracity of [Burisma Official 1]'s aforementioned statements.

(emphases added).

36.   Associate 1 never spoke to Burisma Official 1 on the phone, or in person.  Therefore, the Defendant's claim that Associate 1 called Burisma Official 1 in 2019 is false for that reason as well.

37.   Moreover, at no point when the Defendant was messaging the Handler in May 2020 about Public Official 1 did he mention that he had had two purported meetings when Public Official 1 was in office in the United States where Burisma executives told him that they paid Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1 so that "[Businessperson 1] will take care of all those issues through his dad," referring to a

criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma, and to "deal with" the then-Ukrainian Prosecutor General. Nor did he tell the Handler he had two subsequent phone calls where Burisma Official 1 told him that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1. This was despite the Defendant's stated interest in proving to the Handler that the bribe had occurred and his offer to go to Ukraine to "meet with the guys" to obtain incriminating recordings of Businessperson 1 telling Burisma officials that his father would "take care" of the then-Ukrainian Prosecutor General.

38. On June 29, 2020, the Defendant provided further supplemental information to the Handler concerning his allegations. These were memorialized in the 2020 1023 before it was finalized and consisted of the following:

> Regarding CHS's aforementioned reporting that [Burisma Official 1] said – "he has many text messages and 'recordings' that show he was coerced to make such payments ' – CHS clarified [Burisma Official 1] said he had a total of "17 recordings" involving [Public Official 1 and Businessperson 1]; two of the recordings included [Public Official 1], and the remaining 15 recordings only included [Businessperson 1]. CHS reiterated that, per [Burisma Official 1], these recordings evidence **[Burisma Official 1] was somehow coerced into paying [Public Official 1 and Businessperson 1] to ensure [the then-Ukraine Prosecutor General] was fired.** [Burisma Official 1] stated he has two "documents (which CHS understood to be wire transfer statements, bank records, etc.), that evidence some payment(s) to [Public Official 1 and Businessperson 1] were made, presumably in exchange for [the then-Ukrainian Prosecutor General]'s firing.

> Regarding aforementioned [Associate 1] (alternate spelling, [Associate 1]), who originally introduced CHS into this matter, [Associate 1] currently "works in some office for the administration of [] (NFI)", and also works for [], who

is the founder/CEO of cryptocurrency and blockchain technology business [].

(emphasis added)

39. After the Defendant made these reports, the FBI asked him for travel records, which he provided, in an attempt to determine whether the information he provided was accurate.

40. By August 2020, FBI Pittsburgh concluded that all reasonable steps had been completed regarding the Defendant's allegations and that their assessment, 58A-PG-3250958, should be closed. On August 12, 2020, FBI Pittsburgh was informed that the then-FBI Deputy Director and then-Principal Associate Deputy Attorney General of the United States concurred that it should be closed.

F. The Defendant was interviewed by FBI investigators in September 2023, and repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after meeting with Russian officials.

41. In July 2023, the FBI requested that the U.S. Attorney's Office for the District of Delaware assist the FBI in an investigation of allegations related to the 2020 1023. At that time, the United States Attorney's Office for the District of Delaware was handling an investigation and prosecution of Businessperson 1.

42. On August 11, 2023, the Attorney General appointed David C. Weiss, the United States Attorney for the District of Delaware, as Special Counsel. The Special Counsel was authorized to conduct the investigation and prosecution of Businessperson 1, as well as "any matters that arose from that investigation, may arise from the Special Counsel's investigation, or that are within the scope of 28 C.F.R. § 600.4(a)."

43.   On August 29, 2023, FBI investigators spoke with the Handler in reference to the 2020 1023.  During that conversation, the Handler indicated that he and the Defendant had reviewed the 2020 1023 following its public release by members of Congress in July 2023, and the Defendant reaffirmed the accuracy of the statements contained in it.

44.   The Handler provided investigators with messages he had with the Defendant, including the ones described above.  Additionally, the Handler identified and reviewed with the Defendant travel records associated with both Associate 2 and the Defendant.  The travel records were inconsistent with what the Defendant had previously told the Handler that was memorialized in the 2020 1023.  The Defendant also provided email communications with both Associate 2 and Burisma personnel beginning in 2017 to the Handler, which the Handler reviewed with the Defendant and shared with FBI investigators.

45.   The Defendant was interviewed by FBI investigators on September 27, 2023.  At the start of the interview, the Defendant was warned of his duty to tell the truth pursuant 18 U.S.C. § 1001.

46.   The Defendant repeated his claim that his first meeting with Burisma was much earlier than 2017.  He further told investigators that the first meeting was arranged after Associate 1 called him and said that a company wanted to enter the U.S. market either through an IPO or an acquisition.  The Defendant repeated the claim that Burisma Official 2 was at this meeting and possibly Burisma Official 4, based on the Defendant's recent review of his messages with the Handler that included an image of Burisma Official 4's business card, as described above.  The Defendant told investigators that, during this meeting, Burisma Official 2 said something to the effect of "Did you see my Board, I'm not going to be fucked," and that one member of the Board

1    was the son of Public Official 1.  The Defendant told investigators
2    that Burisma Official 2 said, "I am paying for familia," which the
3    Defendant said was a reference to family or a last name.  Later in the
4    interview, the Defendant said he was 100 percent certain that Associate
5    1 attended the first meeting.

6        47.  The Defendant also told investigators that while he had
7    initially recalled two Burisma meetings, after reviewing Associate 2's
8    travel records provided by the Handler, along with an email the
9    Defendant found, the Defendant concluded that there were maybe two to
10   five meetings.  Later in the interview, the Defendant said he did
11   recall that Associate 2 was present for two meetings.

12       48.  The Defendant told investigators that he had a meeting with
13   Burisma Official 1 at a coffee shop in a German speaking country,
14   possibly Vienna as he had previously reported, after the 2016 election,
15   so in late 2016.  Then he told investigators he could not recall when
16   it occurred, and then, when shown the emails he had with Associate 1
17   as described above, stated he thought it was after those, which would
18   put it in 2017.  Notably, these new and inconsistent statements arose
19   only after the Defendant had reviewed messages, emails, and travel
20   information that were in direct conflict with what he reported in the
21   2020 1023.  The Defendant also told investigators that the meeting in
22   the German speaking country, possibly Vienna, occurred because
23   Associate 1 told the Defendant that Burisma Official 1 wanted to meet,
24   and the Defendant agreed.  Later in the interview, he told investigators
25   that this meeting occurred before the then-Ukrainian Prosecutor General
26   resigned, which was in early 2016.

27       49.  The Defendant told investigators he did not recall talking
28   to Burisma Official 1 ever again after the meeting in the German

1  speaking country and did not have any phone calls with Burisma Official

2  1 after this meeting.

3      50.   The Defendant told investigators that he had asked the then-

4  Ukrainian President to arrange a meeting between himself and the then-

5  Ukrainian Prosecutor General to talk about Burisma.  The Defendant told

6  investigators that this meeting occurred before the then-Ukrainian

7  Prosecutor General resigned, which was early 2016.  The Defendant also

8  told investigators this meeting occurred before his meeting with

9  Burisma Official 1 in the coffee shop in a German speaking country.

10 The Defendant told investigators that after he met with the then-

11 Ukrainian Prosecutor General, he met with the then-Ukrainian President.

12 The Defendant did not provide any of this information to the Handler

13 in 2020.

14     51.   The Defendant also shared a new story with investigators.  He

15 wanted them to look into whether Businessperson 1 was recorded in a

16 hotel in Kiev called the Premier Palace.  The Defendant told

17 investigators that the entire Premier Palace Hotel is "wired" and under

18 the control of the Russians.  The Defendant claimed that Businessperson

19 1 went to the hotel many times and that he had seen video footage of

20 Businessperson 1 entering the Premier Palace Hotel.

21     52.   The Defendant suggested that investigators check to see if

22 Businessperson 1 made telephone calls from the Premier Palace Hotel

23 since those calls would have been recorded by the Russians.  The

24 Defendant claimed to have obtained this information a month earlier by

25 calling a high-level official in a foreign country.  The Defendant also

26 claimed to have learned this information from four different Russian

27 officials.

28

32

53.   The Defendant told investigators that the four different Russian officials are all top officials and two are the heads of the entities they represent.  These Russians said that conversations with Ukrainians about ending the war will include the next U.S. election. The Defendant told investigators he is involved in negotiations over ending the war and had been for the previous four months.  According to the Defendant, the Russians want Ukraine to assist in influencing the U.S. election, and the Defendant thinks the tapes of Businessperson 1 at the Premier Palace Hotel is all they have.  The Defendant told investigators he wants them to ask Businessperson 1 how many times he visited and what he did while at the Premier Palace Hotel.

54.   Businessperson 1 has never traveled to Ukraine.  The few Burisma Board meetings that Businessperson 1 did attend were all outside of Ukraine.

55.   At the conclusion of the interview, the Defendant was asked if he wanted to clarify or correct anything he had stated during this interview, and the Defendant said that he did not need to clarify or correct anything he had stated.

COUNT ONE

[18 U.S.C. § 1001: false statement to a government agent]

56. The Grand Jury re-alleges paragraphs 1 through 55 of this Indictment here.

57. That on or about June 26, 2020, the defendant ALEXANDER SMIRNOV, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, to a special agent of the Federal Bureau of Investigation at Los Angeles, California, in the Central District of California, that is to say:

a. The Defendant's claims that "in late 2015/2016 during the Obama/Biden Administration" he met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that Burisma hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," were false, as he knew.

b. The Defendant's claims that he met with Burisma Official 1 "one or two months later," in Vienna, Austria, around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with" the then-Ukrainian Prosecutor General, were false, as the Defendant knew.

34

c.     The Defendant's claims that he had a telephone call with Burisma Official 1 in 2016 or 2017 wherein Burisma Official 1 stated he did not want to pay Public Official 1 and Businessperson 1 and he was "pushed to pay" them; that nobody would find out about his financial dealings with Public Official 1 and Businessperson 1; and that Burisma Official 1 had many text messages and "recordings" that show that he was coerced to make such payments, were false, as he knew.

d.     The Defendant's claims that in 2019 he was present when Associate 1 called Burisma Official 1 and Burisma Official 1 stated that he did not send any funds directly to the "Big Guy" (which the Defendant understood was a reference to Public Official 1) and that Burisma Official 1 stated it would take them (investigators) 10 years to find the records (i.e., illicit payments to Public Official 1), were false, as he knew.

58.     The statements and representations were false because, as ALEXANDER SMIRNOV then and there knew:

a.     The Defendant met with officials from Burisma for the first time in 2017, after the end of the Obama-Biden Administration. Thus, Public Official 1, then a private citizen, had no ability to "protect" Burisma from "all kinds of problems."  And, there was no discussion of Public Official 1 or Businessperson 1 at this first meeting with Burisma.

b.     The Defendant's second meeting with officials from Burisma also occurred in 2017, not at the end of 2015 when Public Official 1 made public statements critical of the Ukrainian Prosecutor General's Office.  The second meeting also occurred *after* Public Official 1 left office and *after* the then-Ukrainian Prosecutor General had been fired in February 2016.  Like the first meeting, the second

1  meeting the Defendant had with officials from Burisma occurred at a

2  time when Public Official 1 no longer had the ability to influence U.S.

3  policy.    The Defendant also did not travel to Vienna, Austria in

4  December 2015, as he claimed.   And, there was no discussion of Public

5  Official 1 or Businessperson 1 at this second meeting.

6          c.    As to phone calls with Burisma Official 1 in 2016 or

7  2017 and then in 2019, in a subsequent interview with law enforcement

8  in 2023, the Defendant told investigators he had never spoken to Burisma

9  Official 1 on the phone after meeting with Burisma Official 1 in a

10  German speaking country in 2016, and that his last contact with Burisma

11  Official 1 was that meeting in early 2016.

12          d.    Further, Associate 1 never spoke to Burisma Official 1

13  on the phone or in person, in 2019 or at any other time.

15    In violation of Title 18, United States Code, Section 1001.

                              COUNT TWO

[18 U.S.C. § 1519: falsification of records in federal investigation]

     1.    The Grand Jury re-alleges paragraphs 1 through 55 of this Indictment here.

     2.    Between on or about June 26 and 30, 2020, in the Central District of California, the defendant, ALEXANDER SMIRNOV, did knowingly cause the making of a false entry in an FBI Form 1023, a record and document, with the intent to impede, obstruct, and influence a matter that the Defendant knew and contemplated was within the jurisdiction of the United States Department of Justice, a department and agency of the United States, in violation of Title 18, United States Code, Section 1519, and Title 18, United States Code, Section 2.


                                        A TRUE BILL


                                        _____/S/_____
                                        Foreperson


DAVID C. WEISS
Special Counsel


_____
LEO J. WISE
Principal Senior Assistant Special
Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

United States Department of Justice